[No. B201603. Second Dist., Div. Five. Oct. 30, 2008.]

RICK AUERBACH, as Assessor, etc., Plaintiff and Appellant, v.
LOS ANGELES COUNTY ASSESSMENT APPEALS BOARD NO. 2,
Defendant and Respondent;
TWC AVIATION, INC., et al., Real Parties in Interest and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

 \*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of Factual and Procedural Background, part B., and Discussion, part C.

1416

**COUNSEL**

Raymond G. Fortner, Jr., County Counsel, and Albert Ramseyer, Principal Deputy County Counsel, for Plaintiff and Appellant.

No appearance for Defendant and Respondent.

Aerlex Law Group and Marvin W. Murray for Real Parties in Interest and Appellants.

**OPINION**

**MOSK, J.—**

## INTRODUCTION

Real party in interest TWC Aviation, Inc. (TWC Aviation), leased three aircraft from real parties in interest AML Leasing LLC (AML) and DWAL LLC (DWAL)[1] to operate as on-demand air taxis. Petitioner and respondent Rick Auerbach, in his capacity as the Los Angeles County Assessor (Assessor), levied, i.e., enrolled,[2] property tax assessments on the aircraft. TWC applied for changed assessments before the Los Angeles County Assessment Appeals Board No. 2 (Appeals Board). TWC contended, inter alia, that the Assessor's proposed apportionment formula—to account for the time during the tax year that the aircraft were in Nevada—was arbitrary, resulting in a combined valuation by California and Nevada that exceeded 100 percent of the value of the aircraft, and that the Appeals Board should instead adopt the formula used by Nevada. The Appeals Board agreed with TWC and adjusted the assessments accordingly.

The Assessor filed a petition for a writ of administrative mandamus in the trial court seeking to overturn the findings of the Appeals Board. The trial

---

[1] Because TWC Aviation, AML, and DWAL have common ownership and applied jointly to change the property tax assessments that are the subject of this appeal, they will be referred to collectively as TWC where appropriate.

[2] *Heavenly Valley v. El Dorado County Bd. of Equalization* (2000) 84 Cal.App.4th 1323, 1330 [101 Cal.Rptr.2d 591].

court denied the petition as to another issue, but granted it as to the apportionment issue. The Assessor appealed from the denial of the petition as to the other issue. TWC cross-appealed challenging the trial court's ruling on the apportionment issue and arguing that the Appeals Board correctly found that the Nevada apportionment formula was more reasonable than the Assessor's formula, because, inter alia, it avoided duplicative taxation.

 In the published portion of this opinion, we hold that even if the combined valuation of the aircraft by Nevada and California exceeded 100 percent of the value of the property, the Assessor's apportionment formula is not arbitrary, but rather is rationally related to the opportunities, benefits, and protections afforded to TWC by California. Thus, the trial court correctly concluded that the Appeals Board's finding on the apportionment issue should be vacated. Accordingly, we affirm the judgment vacating the Appeals Board's finding on the apportionment issue.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Apportionment Issue*

TWC Aviation, a Nevada corporation with its principal base of operation in Burbank, is a certificated, on-demand air taxi that operates aircraft as an interstate common carrier. An air taxi is a charter operator providing air transportation to the general public. TWC Aviation also performs aircraft management and maintenance.

The three aircraft that are the subject of this appeal are owned by either AML or DWAL[3] and leased to TWC Aviation for management and charter operations. AML, DWAL, and TWC Aviation are all owned by an individual who is a Nevada resident.

After the Assessor enrolled escape assessments[4] on each aircraft, TWC filed applications for a change in the assessments. The applications raised as an issue, inter alia, whether TWC was entitled to a proration of the Los Angeles County taxes because taxes were also paid in Nevada for the same

---

[3] AML purchased a 1995 Astra/Gulfstream business jet in September 2001. AML also purchased a 2003 Cessna Citation 750 business jet in December 2003. DWAL purchased a 1998 Gulfstream G4 business jet in February 2000.

[4] "In California, assessors have a statutory duty to 'assess all property subject to general property taxation at its full value.' (Rev. & Tax. Code, § 401; see Rev. & Tax. Code, § 1361 et seq.) If an assessor discovers property has 'escaped assessment,' i.e., has been underassessed or unassessed, he or she has a constitutional duty to levy retroactive assessments. (Rev. & Tax. Code, §§ 531–531.7; 1 Ehrman & Flavin, Taxing Cal. Property [(3d ed. 1988)] §§ 14:01, p.1, 14.02, 14.03, pp. 6–9.)" (*American Airlines, Inc. v. County of San Mateo* (1996) 12 Cal.4th 1110, 1127 [51 Cal.Rptr.2d 251, 912 P.2d 1198].)

time period. The Appeals Board held a hearing on TWC's applications for changed assessments. The Assessor, based on the contacts of two of the aircraft with Nevada, agreed to apportion the value of each aircraft attributable to the Nevada contacts. TWC, however, disagreed with the Assessor's proposed formula for calculating the apportionment and challenged the proposed apportionment on that basis.

The Appeals Board made the following findings in connection with the allocation for taxes paid in Nevada: "The Applicant provided the Board a Nevada Department of Taxation letter of September 7, 2004, giving a calculation based on their a [sic] methodology that determined an allocation of 5.51% for this aircraft. [¶] The Assessor put before the Board sections of Assessor's Handbook (Exhibit # 7) that states 'In general, the courts have only said that the state[']s tax system must provide for fair apportionment[,] not discriminate against interstate commerce[,] and [be] fairly related to the services provided by the state.' This chapter states '. . . the dollar amount of the other state[']s tax bill is irrelevant.' The Board finds for the Nevada tax calculation as fair and reasonable for this aircraft and the percentage 5.51% as reasonable."[5] The Appeals Board adjusted the assessed value of each aircraft using a 5.51 percent allocation for the taxes imposed by Nevada, allocating 94.49 percent of the value to California, and making an assessment based on the allocation.

The Assessor filed a petition for writ of administrative mandamus in the trial court challenging the findings of the Appeals Board as to each of the three aircraft in issue. The Assessor asserted, inter alia, that the Appeals Board erred by requiring that the three escape assessments be reduced based on an apportionment of value using the calculation by the Nevada Department of Taxation.

On the apportionment issue, the trial court ruled that "[a]bsent any evidence that the County Assessor's apportionment method was contrary to California law, it was an abuse of discretion for the Assessment Appeals Board to require that California use the same method of apportionment that is adopted by a sister state. Such a decision is not supported by substantial evidence contained in the administrative record. [¶] The taxpayer had the burden at the administrative hearing to prove that the method of apportionment used by the County Assessor was contrary to California tax law. The taxpayer failed to carry such burden."

---

[5] The findings on the application relating to the Cessna Citation 750 aircraft contained the following additional finding: "The Nevada calculation correctly assumes that this aircraft will be used in the same manner as the other aircraft in this group." We assume this finding relates to the lack of any evidence in the administrative record that the Cessna was present in Nevada during the tax year.

On June 28, 2007, the trial court entered a judgment granting the Assessor's petition for writ of administrative mandamus as to the apportionment issue and issued a writ of mandate directing the Appeals Board to set aside its decision of June 5, 2006, and to hold further proceedings consistent with the trial court's ruling as contained in its June 4, 2007, minute order. On August 17, 2007, the Assessor filed a notice of appeal from the judgment as to a different issue. On September 7, 2007, TWC filed a notice of cross-appeal from the judgment challenging the ruling on the apportionment issue.

B. *Sales Tax Issue**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISCUSSION

A. *Standard of Review*

"The nature of an issue on appeal determines the appellate court's standard of review in an administrative mandamus case. Questions of law . . . are given a de novo review . . . . (*JKH Enterprises*[, *Inc. v. Department of Industrial Relations* (2006)] 142 Cal.App.4th [1046,] 1058, fn. 11 [48 Cal.Rptr.3d 563].) [¶] In examining the findings in a [Code of Civil Procedure] section 1094.5 case, reviewing courts apply the substantial evidence test. That test is applied to *the trial court's findings* if a fundamental vested right is involved or substantially affected and the trial court exercised its independent judgment in examining the administrative decision. (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 143, fn. 10 [93 Cal.Rptr. 234, 481 P.2d 242].) On the other hand, if no fundamental vested right presents in the case and the trial court applied the substantial evidence test, then the reviewing court's task is the same as the trial court's—examination, under the substantial evidence test, *of the administrative agency's findings.* (*JKH Enterprises, supra*, 142 Cal.App.4th at p. 1058.) When an appellate court examines the administrative findings and determines they are supported by substantial evidence, the court then determines whether those findings support the administrative order or decision. (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 514–515 [113 Cal.Rptr. 836, 522 P.2d 12].)" (*Antelope Valley Press v. Poizner* (2008) 162 Cal.App.4th 839, 851 [75 Cal.Rptr.3d 887].)

" ' "[I]n an administrative mandamus action where no limited trial de novo is authorized by law, the trial and appellate courts occupy in essence identical positions with regard to the administrative record, exercising the appellate function of determining whether the record is free from legal error. [Citations.]" (*Honey Springs Homeowners Assn. v. Board of Supervisors* (1984) 157

---

*See footnote, *ante*, page 1415.

Cal.App. 3d 1122, 1135, fn. 10 [203 Cal.Rptr. 886].) Thus, the conclusions of the superior court, and its disposition of the issues in this case, are not conclusive on appeal. (*Lewin v. St. Joseph Hospital of Orange* (1978) 82 Cal.App.3d 368, 387 [146 Cal.Rptr. 892][.])' (*Orinda Assn. v. Board of Supervisors* (1986) 182 Cal.App.3d 1145, 1160 [227 Cal.Rptr. 688].)" (*Stolman v. City of Los Angeles* (2003) 114 Cal.App.4th 916, 922 [8 Cal.Rptr.3d 178].)

## B. *Apportionment*

### 1. *Background*

The subject aircraft were based in Burbank, California, where they were managed, maintained, and stored by TWC Aviation when not in use. On occasion, however, at least two of the aircraft were flown to and from Nevada during the tax year preceding the lien date.[8] Based on the time the aircraft were in Nevada, the Nevada taxing authorities imposed a prorated property tax on the aircraft using a four-part formula[9] that apportioned 5.51 percent of the value of the aircraft to their situs in Nevada. Based on that tax liability in Nevada, TWC applied to the Appeals Board for a reduction of each escape assessment in an amount equivalent to 5.51 percent of the total value of the aircraft.

The Assessor did not dispute that some apportionment was appropriate, but disagreed with the 5.51 percent reduction. Using a different and more simplified methodology than that employed by Nevada, the Assessor calculated an apportionment that attributed only .5 percent of the value of each aircraft to use in Nevada.

During the hearing before the Appeals Board, TWC introduced a document from Nevada showing the basis for Nevada's 5.51 percent calculation. TWC argued that Nevada's four-part formula was more reasonable than the Assessor's "arbitrary" methodology. TWC also emphasized that ignoring the 5.51 percent apportionment imposed in Nevada, and instead using the 0.5 percent figure calculated by the Assessor, would result in a combined valuation by California and Nevada that exceeded 105 percent of the value of the three aircraft.

---

[8] The Assessor each year assesses all taxable property in the county on the lien date to the person who owns that property on that date. (Rev. & Tax. Code, §§ 401.3, 405, subd. (a).) The lien date is the date on which the taxes for a fiscal year attach to and become a lien against the property. (Rev. & Tax. Code, § 117.)

[9] The formula included the "weighted ground time ratio as indicated by the flight schedules, plane hours, originating and terminating tonnage and revenue for miles flown in Nevada."

One of the Assessor's appraisers, who reviewed flight logs for the aircraft and calculated the number of days the aircraft were in Los Angeles County,[10] Nevada, and other locations during the tax year, described how the Assessor arrived at the 0.5 percent figure. Under the Assessor's methodology, if an aircraft was on the ground at a given location at 12:00 a.m., that aircraft was considered to have been at that location for the entire day. No effort was made to account for the location of the aircraft at other hours. In support of the Assessor's calculation, the appraiser submitted the calendar pages she used to calculate the days the respective aircraft spent in Los Angeles County, Nevada, and other locations.[11] TWC argues that the Assessor's methodology ignores the days that the aircraft were in Nevada at times other than midnight, explaining that under the Assessor's formula, "as much as twenty three hours and fifty-nine minutes spent in Nevada not encompassing midnight would have no effect whatsoever on the California assessment."

## 2. *Apportionment Proper*

The parties agree that the escape assessment for each aircraft should have been adjusted to account for time the aircraft spent in Nevada during the tax year because the Nevada tax authorities imposed a prorated property tax on the aircraft based on that same time period.[12] They also agree that the adjustment should be made by apportioning the time the aircraft spent in Los Angeles County and the time spent in Nevada. But they disagree as to the proper methodology for making the apportionment.

The court in *Ice Capades, supra,* 56 Cal.App.3d at page 755, approved as a general proposition an apportionment formula that "apportions to the County

---

[10] Because the tax situs of the aircraft while in California was in Los Angeles County, there would be no apportionment with other counties in California. (See *Ice Capades, Inc. v. County of Los Angeles* (1976) 56 Cal.App.3d 745, 756 [128 Cal.Rptr. 717] (*Ice Capades*).)

[11] The appraiser did not have sufficient information to determined if or how long the Cessna Citation 750 was in Nevada during the tax year. (See fn. 5, *ante* and fn. 15, *post*.)

[12] It has been said, "State laws generally require apportionment in the case of an airline company. All other aircraft, including charter aircraft and Part 91 aircraft, are typically subject to property tax only in the state where the aircraft is based." (Crowther, *Taxation of Fractional Programs: "Flying Over Uncharted Waters."* (2002) 67 J. Air L. & Com. 241, 293, fn. omitted.) "As a practical matter, most States have a vested interest in not trying to tax non-resident aircraft. The only way to tax non-resident aircraft would be to lower the 'situs' bar. Although a lower bar might allow the States to tax more non-resident aircraft, it would also allow more resident aircraft to qualify for apportionment. At best, the States would have to do a lot more work simply to get to the same result. But the more likely answer is that, given the relative resources of the local governments and taxpayers the States would end up losing more than they gained. [¶] . . . [In] States where the laws have been amended to allow apportionment of resident charter or business aircraft, such as . . . Nevada . . . , the tax authorities have become more aggressive in attempting to tax non-resident aircraft." (*Id.* at p. 292, fn. 215.)

of Los Angeles, as the domicile of [the taxpayer], the proportion of the value of the property which the period of the tax year during which the property was not present in [the other state] bears to 365 days." According to the Assessor, his formula comports with the one outlined in *Ice Capades*. Under the Assessor's formula, which is based on the location of the aircraft at 12:00 a.m. of a given day, 99.5 percent of each aircraft's value was allocated to Los Angeles County, whereas Nevada's formula resulted in a 5.51 percent of the value of each aircraft being allocated to that state.

TWC argues that the Assessor's formula is arbitrary and unfair and that Nevada's multi-factor formula is more reasonable. Therefore, according to TWC, the Assessor was required to utilize Nevada's calculation to avoid duplicative taxation.[13]

In support of its contention, TWC cites to five United States Supreme Court decisions,[14] asserting that those decisions prohibit taxation by two or more states that results in a tax on more than 100 percent of the value of the property, because such a tax would be a burden on interstate commerce in violation of the commerce clause and due process clause of the United States Constitution. (U.S. Const., art. I, § 8, cl. 3; U.S. Const., Amend. XIV, § 1.) The decisions upon which TWC relies, however, do not state or imply that taxation by two or more states that results in a tax on more than 100 percent of the value of the property is always prohibited under the Constitution. Instead, those cases merely recognize that moveable personal property can acquire a tax situs in a state other than the domicile state and that in such cases, the property tax must be "fairly apportioned" between the two states. (See generally 1 Hellerstein, State Taxation (3d ed. 2007) Constitutional Limitations and Corporate Income and Franchise Taxes, § 4.08[1], pp. 4-35 to 4-38.) Here, the parties agree that the subject aircraft established a taxable situs in Nevada during the relevant tax year and that some tax apportionment between California and Nevada is appropriate. Thus, the cases upon which TWC relies are inapposite to the issue posed here—whether two states' combined valuations of the same moveable business property that exceed 100 percent of the value of the property are per se prohibited under the federal Constitution.

---

[13] At oral argument, TWC invoked the concept of a unitary tax. That methodology, which values an enterprise as a whole without regard to the individual assets making up that enterprise, is not directly applicable here. (See *American Airlines, Inc. v. County of San Mateo* (1996) 12 Cal.4th 1110, 1124–1127 [51 Cal.Rptr.2d 251, 912 P.2d 1198].)

[14] *Braniff Airways v. Nebraska Board* (1954) 347 U.S. 590 [98 L.Ed. 967, 74 S.Ct. 757]; *Standard Oil Co. v. Peck* (1952) 342 U.S. 382 [96 L.Ed. 427, 72 S.Ct. 309]; *Ott v. Mississippi Barge Line* (1949) 336 U.S. 169 [93 L.Ed. 585, 69 S.Ct. 432]; *Union Transit Co. v. Kentucky* (1905) 199 U.S. 194 [50 L.Ed. 150, 26 S.Ct. 36]; *Pullman's Car Co. v. Pennsylvania* (1891) 141 U.S. 18 [35 L.Ed. 613, 11 S.Ct. 876].

Like the trial court, the Assessor relies upon the Supreme Court decision in *Moorman Mfg. Co. v. Bair* (1978) 437 U.S. 267 [57 L.Ed.2d 197, 98 S.Ct. 2340] *(Moorman)*. In that case, the State of Iowa imposed income tax on an Illinois manufacturer using a single-factor test based on the proportion that the manufacturer's gross sales in Iowa bore to its total gross sales. *(Id.* at p. 270.) The manufacturer's sales in Iowa accounted for approximately 20 percent of its total sales. *(Id.* at p. 269.) The manufacturer challenged the constitutionality of the single-factor formula in the Iowa courts, prevailing in the trial court, but losing in the Iowa Supreme Court. *(Id.* at p. 271.)

In affirming the decision of the Iowa Supreme Court, the United States Supreme Court addressed the manufacturer's contention that the commerce clause of the federal Constitution prohibits *any* duplicative or overlapping taxation by two or more states. *(Moorman, supra,* 437 U.S. at pp. 277–278.) In rejecting that contention, the Supreme Court said: "The only conceivable constitutional basis for invalidating the Iowa statute [mandating the use of a single-factor formula] would be that the Commerce Clause prohibits any overlap in the computation of taxable income by the States. If the Constitution were read to mandate such precision in interstate taxation, the consequences would extend far beyond this particular case. For some risk of duplicative taxation exists whenever the States in which a corporation does business do not follow identical rules for the division of income. Accepting [the Illinois manufacturer's] view of the Constitution, therefore, would require extensive judicial lawmaking. Its logic is not limited to a prohibition on use of a single-factor apportionment formula. The asserted constitutional flaw in that formula is that it is different from that presently employed by a majority of States and that difference creates a risk of duplicative taxation. But a host of other division-of-income problems create precisely the same risk and would similarly rise to constitutional proportions." *(Id.* at p. 278.)

The United States Supreme Court in *Moorman, supra,* 437 U.S. 267, therefore concluded: "The prevention of duplicative taxation, therefore, would require national uniform rules for the division of income. Although the adoption of a uniform code would undeniably advance the policies that underlie the Commerce Clause, it would require a policy decision based on political and economic considerations that vary from State to State. The Constitution, however, is neutral with respect to the content of any uniform rule. . . . [¶] . . . [¶] While the freedom of the States to formulate independent policy in this area may have to yield to an overriding national interest in uniformity, the content of any uniform rules to which they must subscribe should be determined only after due consideration is given to the interests of all affected States. It is clear that the legislative power granted to Congress by the Commerce Clause of the Constitution would amply justify the enactment of legislation requiring all States to adhere to uniform rules for the division of

income. It is to that body, and not this Court, that the Constitution has committed such policy decisions." (*Id.* at pp. 279–280.)

■ Based on *Moorman, supra*, 437 U.S. 267, we reject TWC's assertion that *any* overlap in taxation between two states is strictly prohibited under the Constitution. Rather, the apportionment issue turns on whether the Assessor's formula imposes a property tax that is not rationally related to TWC's business operations in Los Angeles County. (See *Barclays Bank Internat., Ltd. v. Franchise Tax Bd.* (1992) 2 Cal.4th 708, 720 [8 Cal.Rptr.2d 31, 829 P.2d 279] [quoting *Moorman* that " 'the States have wide latitude in the selection of apportionment formulas and . . . a formula-produced assessment will only be disturbed when the taxpayer has proved by clear and cogent evidence that the income attributed to the State is in fact out of all appropriate proportion to the business transacted . . . in that State' "].)

■ In *Ice Capades, supra*, 56 Cal.App.3d 745, the court determined that the moveable personal property of the taxpayer domiciled in Los Angeles County had acquired a tax situs in New Jersey. (*Id.* at pp. 754–755.) The court held that "[s]ince the property of [the taxpayer] absent from California had acquired a tax situs in New Jersey so as to be subject to taxation in that state, the County of Los Angeles was limited in its power of taxation of the property to its value fairly apportioned to California. (*Standard Oil Co.* v. *Peck, supra*, 342 U.S. 382, 384–385 [96 L.Ed. 427, 430–431].) The development of a formula of apportionment is primarily the task of the authority imposing the tax." (*Ice Capades, supra*, 56 Cal.App.3d at p. 755.)

■ The United States Supreme Court recently restated the limitations that the commerce clause and due process clause of the federal Constitution impose upon a state's power to tax: "The Commerce Clause and the Due Process Clause impose distinct but parallel limitations on a State's power to tax out-of-state activities. [Citations.] The Due Process Clause demands that there exist ' "some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax," ' as well as a rational relationship between the tax and the ' " 'values connected with the taxing State.' " ' [Citations]. The Commerce Clause forbids the States to levy taxes that discriminate against interstate commerce or that burden it by subjecting activities to multiple or unfairly apportioned taxation. [Citations.] The 'broad inquiry' subsumed in both constitutional requirements is ' "whether the taxing power exerted by the state bears fiscal relation to protection, opportunities and benefits given by the state" '—that is, ' "whether the state has given anything for which it can ask return." ' [Citations.]" (*MeadWestvaco Corp. v. Illinois Dept. of Revenue* (2008) 553 U.S. ___, ___ [170 L.Ed.2d 404, 128 S.Ct. 1498, 1505].)

In the instant case, there is nothing in the administrative record to suggest that the Assessor's formula resulted in a tax that has no rational relationship to the opportunities, benefits, and protections conferred upon or afforded to TWC based on the presence of TWC's aircraft in California during the tax year. The evidence is to the contrary. As to one of the aircraft, there was no record that it had any presence in Nevada during the tax year.[15] As to the other two aircraft, the relevant flight logs showed that one had been in Nevada for eight of the 365 days of the tax year and the other had been there only two days during that year. By contrast, the flight logs showed that the aircraft that spent eight days in Nevada spent 177 days in California, and the aircraft that spent two days in Nevada spent 212 days in California. In addition, the evidence showed that the aircraft were based and maintained in Burbank and that they were chartered from TWC Aviation's facilities in Burbank. That evidence supports a rational inference that TWC was afforded substantial opportunities, benefits, and protections by California based on the presence of the three aircraft in Los Angeles County during the tax year.

That the Assessor used a formula based on the aircraft's location at 12:00 a.m. is not, as TWC contends, arbitrary. Although aircraft, unlike the personal property at issue in *Ice Capades, supra*, 56 Cal.App.3d 745, can and do change locations within a given day, the 12:00 a.m. standard has some rational relationship to an aircraft's location during the day. Indeed, it would be burdensome and impractical to try to determine the exact amount of time an aircraft was in Nevada as compared with California. If an aircraft was on the ground in Nevada at 12:00 a.m., it is likely it was present there for at least a significant portion of a day. Thus, the Assessor's methodology employs a bright-line test that is less complicated than other methodologies that might have been used. Because the development of an apportionment formula is primarily the task of the authority imposing the tax (*id.* at p. 755), we will not substitute our judgment for that of the Assessor, absent a clear showing that the value attributed to Los Angeles County is not within a reasonable proportion to the presence of the three aircraft there during the tax year. There is no such showing here.

TWC failed to demonstrate that there was no rational relationship between the Assessor's apportionment calculation and the determined presence of the aircraft in California during the tax year. As a result, the Assessor's methodology was not arbitrary or otherwise improper.

---

[15] The appraiser from the Assessor's office identified the aircraft purchased in December 2003—the Cessna Citation 750—as the TWC aircraft that had no record of a Nevada presence during the tax year.

C. *Sales Tax*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment of the trial court is affirmed. The parties shall bear their own costs on appeal.

Armstrong, Acting P. J., and Kriegler, J., concurred.

---

.[*]See footnote, *ante*, page 1415.