Filed 10/14/15  Prang v. Los Angeles County Assessment Appeals Bd. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| JEFFREY PRANG in his capacity as Los Angeles County Assessor,<br><br>        Plaintiff and Appellant,<br>                v.<br><br>LOS ANGELES COUNTY ASSESSMENT APPEALS BOARD NO. 3,<br><br>        Defendant and Respondent;<br><br>OCCIDENTAL PETROLEUM CORPORATION et al.,<br><br>        Real Parties in Interest and Appellants. | B260580<br><br>(Los Angeles County<br>Super. Ct. No. BS145750) |

APPEAL from a judgment of the Superior Court of Los Angeles County. James C. Chalfant, Judge.  Affirmed.

Mark J. Saladino, County Counsel, Albert Ramseyer, Deputy County Counsel for Defendant and Appellant County of Los Angeles.

Cahill Davis & O'Neall, C. Stephen Davis, Cris K. O'Neall and Andrew W. Bodeau, for Real Parties in Interest and Appellants Occidental Petroleum Corp. and Swiftlite Aircraft Corp.

_____

Occidental Petroleum Corporation and its wholly-owned subsidiary Swiftlite Aircraft Corporation (collectively Oxy) own a fleet of five corporate jets which are hangared in Los Angeles County. As such, the Los Angeles County Tax Assessor assessed Oxy for personal property tax based on the value of the jets. Oxy took the position that its property tax obligation for the jets must be reduced, because the jets spend sufficient time in different states and countries to have acquired tax situs in those other jurisdictions. The assessor agreed that Oxy's tax should be apportioned if its jets had acquired tax situs in other jurisdictions, but believed Oxy had not made a factual showing sufficient to establish any tax situs other than California.

Oxy disputed the determination before Los Angeles County Assessment Appeals Board No. 3 (the board). After a hearing, the board ruled in favor of Oxy, determining that Oxy's property tax burden must be reduced for the time its planes spent in 31 different jurisdictions. The assessor brought a petition for writ of administrative mandate, challenging (1) the board's legal determination; (2) the absence of any actual board finding that the 31 jurisdictions constituted tax situses for Oxy's jets; and (3) the lack of evidence to support any such findings.

The trial court granted the writ. The court (1) clarified the law regarding the quantum of contacts necessary to establish alternative tax situs; (2) concluded that the board had not made findings as to whether Oxy had established any jurisdiction as an alternative tax situs; and (3) remanded the matter to the board for new findings in light of the trial court's statement of decision.

Both parties appeal, although, for the most part, neither party questions the trial court's discussion of the governing law. The assessor contends only that the trial court erred in concluding that the tax situs of the jets is to be determined on a fleet-wide basis, rather than plane-by-plane. Oxy argues that the board's findings were sufficient or that

2

necessary findings can be implied and, therefore, there is no need to remand to the board.[1]  We disagree with both parties and affirm.

## DISCUSSION

1.    *Governing Legal Principles*

Before discussing the detailed factual and procedural history of the case, it is useful to understand the law governing property taxation of the planes at issue.  Oxy's corporate jets are considered general aviation aircraft, as opposed to commercial aircraft or fractionally-owned aircraft (both of which are taxed differently).  General aviation aircrafts are taxed as personal property in the county in which they are hangared. (*NetJets Aviation, Inc. v. Guillory* (2012) 207 Cal.App.4th 26, 34 (*NetJets*).)  However, if a taxpayer can establish that its personal property has acquired a tax situs in a jurisdiction other than where it is domiciled, the domiciliary state must *reduce* its tax to include only such property values as are *not* subject to the potential of taxation elsewhere.  (*Ice Capades, Inc. v. County of Los Angeles* (1976) 56 Cal.App.3d 745, 752 (*Ice Capades*).) This is a requirement imposed by the due process and commerce clauses of the United States Constitution.  (*Netjets* at p. 49.)

The issue is one of *tax situs* in the other jurisdiction, not taxation itself.  A taxpayer can establish the necessity of apportionment simply by showing that another jurisdiction *could* impose a property tax on the property.  (*Flying Tiger Line, Inc. v. County of Los Angeles* (1958) 51 Cal.2d 314, 319 (*Flying Tiger*).)  Indeed, the term "tax situs" simply means that the location in question has sufficient contacts to confer jurisdiction to tax.  (*Zantop Air Transport, Inc. v. County of San Bernardino* (1966) 246 Cal.App.2d 433, 437.)

---

[1]    In its briefs on appeal, Oxy argues in passing that the board was correct on the law, but does not assign as error any part of the trial court's differing interpretation of controlling authority.

3

Many cases have considered the issue of the "quantum of contact of property and its owner with a state necessary to establish a tax situs." (*Ice Capades, supra,* 56 Cal.App.3d at p. 753.) While the determination is ultimately one of fact, there are certain guiding principles which can be distilled from the case law. To comport with the commerce and due process clauses, any tax imposed must be fairly related to services provided by the state. (*NetJets, supra,* 207 Cal.App.4th at p. 48.) To do so, the tax must have relation to " 'opportunities, benefits or protection conferred or afforded' " by the taxing state. (*Braniff Airways, Inc. v. Nebraska State Bd. of Equalization & Assessment* (1954) 347 U.S. 590, 600 (*Braniff*).)

When the issue is one of tax situs over movable personal property, such as aircraft, a mere transitory stay in another state is not sufficient to establish tax situs. (*Ice Capades, supra,* 56 Cal.App.3d at p. 754.) Both the length of time that the property is in the other state and the intent of its presence are significant to tax situs. (*Id.* at p. 753.) If the intent is merely that the property remain in the other location for a short period and then move on, or return home, it is not enough for tax situs. (*Ibid.*) In order to establish situs, the property must have a "more or less permanent location as distinguished from a transient or temporary one. However, permanency in the sense that it must be fixed like real property is not essential to the establishment of a taxable situs for personal property. It seems to be sufficient when, in the ordinary course of business, that property is present and being used and employed with a consistent continuity and not spasmodically and temporarily." (*Reeves v. Island Creek Fuel & Transportation Co.* (Ky.App. 1950) 230 S.W.2d 924, 927 (*Reeves*).)

Also significant to the determination is the nature of the property owner's contact with the other jurisdiction. "The nature of the contact is relevant to the 'opportunities, benefits, or protection' which must be afforded by a state if it is to have power to tax." (*Ice Capades, supra,* 56 Cal.App.3d at pp. 753-754.)

The question of tax situs can be especially complicated when the taxpayer owns a quantity of virtually identical property – such as railroad cars, cargo containers, or airplanes. Suppose a taxpayer *nearly always* has a fixed quantity of railroad cars on

4

routes in another state, but the precise cars that are in that state vary. The Supreme Court concluded that a tax situs existed in the second state, because the taxpayer's freight cars were "habitual[ly] employ[ed]" on fixed routes and regular schedules there. (*Central R. Co. v. Pennsylvania* (1962) 370 U.S. 607, 613.) Thus, the domiciliary state could not tax on the "daily average of freight cars" in the second tax situs. (*Id.* at p. 614.) However, regular travel on fixed routes is not a necessary prerequisite to establishing a tax situs. "Habitual employment within the State of a substantial number of cars, albeit on irregular routes, may constitute sufficient contact to establish a tax situs permitting taxation of the average number of cars so engaged." (*Id.* at p. 615.) The use of the term "habitual employment" should not be understood to mean that a taxpayer's property acquires tax situs in every location the taxpayer and its property "habitually" visit. " 'Habitual employment' during the tax year of similar items of [taxable personal] property requires that the aggregate of the property be considered in determining the contact with the jurisdiction. It is not, of itself, a basis of tax situs." (*Ice Capades, supra,* 56 Cal.App.3d at p. 754, fn. 2.)

2.    *The Proceedings Before the Board*

Oxy, as noted above, has five corporate jets. It operates those jets as a single, integrated fleet. It operates the jets around the world, flying to locations within and outside the U.S., where it has business interests. There is no dispute that Oxy's fleet is subject to property taxation in California, where the fleet is hangared. The issue is whether Oxy could establish tax situs in any other state or country.

Based on a somewhat simplified understanding of the law discussed above, Oxy argued before the board that its fleet had tax situs *in every location where it had a significant business interest and its jets made at least one landing*.[2] Oxy's evidence

---

[2]    Oxy had also argued, in the alternative, that its fleet had tax situs *in every location where its jets made at least one landing* without regard to the presence of a significant business interest. This was based on authority relating to taxation of fractionally-owned

5

before the board fell broadly within two categories: (1) evidence identifying 31 locations and showing that Oxy had a significant business interest there irrespective of the presence of its aircraft; and (2) evidence supporting Oxy's calculations of the tax burden that should be apportioned with respect to each of the 31 locations. This latter category of evidence began with more than 1000 pages of flight logs, recording every flight taken by Oxy's jets within the 2003-2011 tax years at issue. From this raw data, Oxy created, on a jet-by-jet and year-by-year basis, spreadsheets identifying all trips to each of the 31 business locations, and calculating the total number of days each jet spent in each location in each year (jet-by-jet/year-by-year spreadsheets). This data, in turn, was used to create a single page spreadsheet, identifying for each year the total number of days each jet was in any of these 31 business locations, and calculating a proportionate reduction in the tax assessed (tax apportionment spreadsheet).[3] We here note that what was missing from Oxy's calculations – although present in its raw flight logs and jet-by-jet/year-by-year spreadsheets – was anything demonstrating the *frequency* of Oxy's jets' trips to each location claimed as a tax situs. One cannot easily determine from Oxy's data *how often* and *over what period* Oxy's jets flew to any particular purported tax situs.

In response, the assessor took a much stricter view of tax situs, and argued that Oxy's jets did not spend long enough in any other jurisdiction to have acquired tax situs anywhere but California. The assessor created an exhibit showing the percentage of the year spent by Oxy's jets in each location, but only for the most commonly visited

---

aircraft. (See Rev. & Tax. Code, § 1161, subd. (b); *NetJets, supra,* 207 Cal.App.4th at p. 51.) Oxy no longer pursues this theory on appeal.

[3] Thus, for example, the jet with tail number 961V spent 94 days at some of the 31 identified business locations Oxy claimed as tax situses in 2008. 94 days is 25.8 percent of a year; so Oxy sought a 25.8 percent reduction in the property tax owed for that jet for that year. The assessor did not take issue with Oxy's math, but with its determination of tax situses.

locations.[4] Again, one cannot determine from the assessor's data how often and over what period Oxy's jets flew to any location that Oxy claimed as a tax situs.

3.     *The Board's Decision*

The board ordered the assessor to reduce the tax on the planes in accordance with Oxy's tax apportionment spreadsheet. However, the board never actually made findings that Oxy had established a tax situs in each of the 31 locations for which Oxy claimed apportionment. Indeed, the board's language in this regard is somewhat guarded. The board found that "Oxy presented information that met the burden of showing that the subject property is *at times beyond the reach of the taxing power of its domicile*," (italics added) but did not state that this was true with respect to all 31 claimed tax situses. Indeed, to the extent the board focused on the evidence pertaining to any specific claimed tax situs, it only mentioned Oxy's contacts with six such locations, and otherwise referred to only Oxy's general exhibits showing where it had contacts, employees or paid property taxes (on property other than its jets).[5] We observe that Oxy did not have employees or pay property taxes in all of the jurisdictions in which it sought tax situs.[6]

---

[4]     For example, the assessor's chart shows that in 2008, one of Oxy's jets spent 14.52 percent of the year in United Arab Emirates, while a second jet spent 4.66 percent of its time there and a third only 1.92 percent.

[5]     Before the board, Oxy presented Exhibit O, which identifies other states where it paid property taxes on some of its property. Oxy's witness admitted that it was not assessed, and did not pay, property taxes for the aircraft at issue to any jurisdiction other than California.

[6]     Oxy sought, and the board granted, apportionment with respect to the location of Cyprus. The board did not mention Cyprus specifically in its ruling, but apparently relied on Oxy's general exhibits. Oxy has no employees in Cyprus and paid no property tax in Cyprus. Nor does Oxy have any subsidiaries or assets in Cyprus. Oxy's only evidence regarding its contacts with Cyprus states that one member of Oxy's board of directors, "the Lead Independent Director, maintains offices on the island of Cyprus." There is nothing in the board's opinion that shows it actually considered whether this evidence

7

4.      *The Trial Court's Decision*

The assessor obtained trial court review by means of a petition for writ of administrative mandate.  The assessor argued that the board had misunderstood the governing law.  The assessor also argued that the board's conclusion was not supported by its findings, nor was its determination supported by substantial evidence.

The trial court ultimately agreed in large part with the assessor.  The court rejected Oxy's legal theory, apparently adopted by the board, that substantial business contacts plus a single flight are sufficient to establish tax situs.  Instead, the court reviewed the applicable law and determined that the issue of tax situs is determined by whether a portion of Oxy's fleet is "regularly, habitually and/or continuously employed" in another jurisdiction.  Stated differently, the issue is whether the planes "regularly visited" the other jurisdictions and for how long.  The trial court concluded that the presence of Oxy offices in another jurisdiction is relevant to the tax situs determination.  But it is relevant *only* because in determining whether the planes' contact with the other jurisdiction is transitory or regular, a relatively permanent Oxy business location in the other jurisdiction is a factor that would tend to show a need for its planes to visit regularly.  But a permanent business location alone does not transform an *infrequently* visited location into a tax situs.[7]

The court also concluded that the board never determined whether there was a sufficient quantum of contact between Oxy's jets and each of the 31 locations to establish tax situses there.  The court noted not only an *actual* absence of findings in this regard, but also recognized that the evidence *cited* by the board "shows that Oxy maintains

---

established a significant business interest sufficient to establish a tax situs, even under Oxy's version of the law.

[7]      The trial court also specifically concluded that whether Oxy paid property taxes in another jurisdiction was irrelevant to the tax situs determination unless the property tax paid was for the jets themselves.

8

offices in various jurisdictions and flies its planes to those locations. It does not indicate how frequently a plane flies to any particular location, and each location must be treated separately for evaluation of its tax situs status."

The trial court did, however, note that Oxy may well have provided the board with sufficient evidence from which it could make the necessary tax situs determination. The court recognized that the flight logs could establish "the number of flights and aircraft days spent at each location." However, Oxy did not proceed on this basis; Oxy presumed that every business location was a tax situs, and thus assumed the frequency of its trips was irrelevant to the issue of tax situs.[8]

Both parties appeal. The assessor contends the trial court erred in holding that the determination of tax situs is to be made on a fleet-wide, rather than jet-by-jet, basis. Oxy contends that the board's findings are sufficient and there is no need to remand for the board to make further findings.

5.      *Standard of Review*

Code of Civil Procedure section 1094.5 sets forth the procedure for the review of a final administrative decision. "The inquiry in such a case shall extend to the questions whether the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (Code Civ. Proc., § 1094.5, subd. (b).) We review questions

_____

[8]      Our review of the administrative record suggests that it was Oxy's position below that the frequency of its trips was of no concern to the tax situs determination. Oxy's counsel argued to the board, "Under the *Ice Capades* case . . . the law is such that if there are business locations in which the tax payer is doing business out of state and its personal property travels to those locations, that is sufficient for apportionment of those stays out of state for property tax purposes." Indeed, Oxy concedes in its respondent's brief on appeal that it "measured the number of flights to a particular location to calculate the apportionment, not to establish situs as such." Oxy's counsel agreed that this was it position at oral argument on appeal.

9

of law de novo. (*Auerbach v. Los Angeles County Assessment Appeals Board No. 2* (2008) 167 Cal.App.4th 1415, 1420 (*Auerbach*).) As to whether the findings are supported by the evidence, this is a case in which no fundamental vested right is at issue. Thus our task is the same as the trial court's – we review the administrative findings to determine if they are supported by substantial evidence in the administrative record. (*Midstate Theatres, Inc. v. County of Stanislaus* (1976) 55 Cal.App.3d 864, 874 (*Midstate Theatres*).)

We must also determine whether the administrative agency's findings support its decision. (*Auerbach, supra,* 167 Cal.App.4th at p. 1420.) An administrative agency's findings must bridge the analytic gap between the raw evidence and its ultimate decision or order. (*Midstate Theatres, supra,* 55 Cal.App.3d at p. 887.) The requirement of findings helps the administrative body draw legally relevant sub-conclusions in support of its ultimate decision. (*Ibid.*) Its effect is to facilitate orderly analysis and minimize the likelihood that the agency will randomly leap from evidence to conclusions. (*Orinda Assn. v. Board of Supervisors* (1986) 182 Cal.App.3d 1145, 1161.) Findings enable the reviewing court to trace and examine the agency's mode of analysis. (*Ibid.*)

6.    *The Assessor's Appeal: Tax Situs Is To Be Determined Fleet-Wide*

In its appeal, the assessor argues that the trial court erred in concluding that the determination of tax situs is to be made based on the contacts of Oxy's entire fleet of jets, rather than on a jet-by-jet basis. The assessor cites no law for this proposition, and all authority is to the contrary.[9] Indeed, the entire body of law based on "habitual employment" is based on the idea that a taxpayer's property can be habitually employed

---

**9**    The assessor relies only on statements in the State Board of Equalization's Assessors' Handbook, which, in the assessor's own words, "suggest[] by implication that the apportionment of a general aircraft assessment is considered on an aircraft by aircraft basis." But Oxy does not dispute that each aircraft is to be *assessed* individually; the issue is solely whether the determination that any individual aircraft may or may not claim *a tax situs* in a particular jurisdiction is to be based on that single aircraft's contacts or the fleet's contacts with that jurisdiction.

10

in the other jurisdiction, even though no single piece of property regularly is. "[I]f the nondomiciliary owner habitually employs movable property in the jurisdiction for all or a greater part of the tax year, the property acquires a tax situs although any one item of the property mix may be present for only a short predetermined period. [Citations.]" (*Ice Capades, supra,* 56 Cal.App.3d at p. 754. See also *Sea-Land Service, Inc. v. County of Alameda* (1974) 12 Cal.3d 772, 778 ["While no specific container may be in the county for a substantial period of time, [taxpayer]'s containers are physically present in the county on every day of the year. Such habitual presence of containers creates a taxable situs, even though the identical containers are not there every day and even though none of the containers is continuously within the county."]; *Braniff, supra,* 347 U.S. at pp. 600-601 [upholding a determination of tax situs based on the taxpayer's frequent landings in the jurisdiction "even though the same aircraft do not land every day"]; *Reeves, supra,* 230 S.W.2d at p. 927 ["courts generally adhere to the rule that property sent into a state by a nonresident, to be used or employed permanently there, must bear its fair share of the burden of taxation, although no one unit of such property is ever more than temporarily located within the taxing state"].) As explained by Justice Traynor, "Random excursions of migratory property into a state do not render the property taxable there, but if there is habitual use of such property in a state, the average amount thus habitually used is taxable there, even though the specific items are not continuously the same." (*Flying Tiger, supra,* 51 Cal.2d at p. 327 (dis. opn. of Traynor, J.).)

We also find the assessor's policy argument unavailing. The assessor argues that fleetwide determinations will undermine the policy in favor of uniform assessments, in that the owner of a fleet will be assessed on a different basis than the owner of a single aircraft. But a fleetwide determination of tax situs enables uniform assessments. Suppose a taxpayer with a single aircraft establishes a tax situs in Nevada based on regular weekly trips of that aircraft to that state. A second taxpayer makes the same weekly trips to Nevada, but does so with a rotating fleet of over 50 jets. No one jet makes more than a single annual trip to Nevada; considered on a jet-by-jet basis, the taxpayer with the fleet cannot establish a tax situs in Nevada. But, as far as Nevada is

11

concerned, each taxpayer is burdening Nevada's resources in precisely the same amount – a weekly trip taking advantage of Nevada's opportunities, protections and benefits. If the taxpayer with a single jet has a tax situs in Nevada, the taxpayer with a fleet has one as well. Any other result would be inequitable.

7.      *Oxy's Appeal:*

        a.      *The Board Did Not Make Adequate Findings*

Turning to Oxy's appeal, Oxy first argues that the trial court erred in concluding the board's findings were inadequate. We disagree; the issue before the board was whether Oxy had established a tax situs under governing law in each of the 31 claimed jurisdictions. The board did not make that determination. Instead, at Oxy's instigation, the board found only that Oxy had business contacts at each jurisdiction and landed its jets there at least once. But such a finding is insufficient to establish tax situs.

Oxy argues, however, that findings can be inferred where supported by the evidence. This is true; we can infer a finding if it is consistent with the judgment and "results by necessary implication from the express findings which were made." (*Golde v. Fox* (1979) 98 Cal.App.3d 167, 179.) Oxy suggests that we can infer that, by concluding Oxy was entitled to the allocations set forth in its tax apportionment spreadsheet, the board impliedly found that each location encompassed by that spreadsheet was a tax situs. But implied findings must be supported by the evidence. (*Id*. at p. 180.) Oxy argues that the "undisputed evidence of situs" satisfies the substantial evidence standard.

Our review of the evidence in connection with one claimed tax situs – Georgia – convinces us that we should not imply that the board found one or more tax situses in the various states. Review of the jet-by-jet/year-by-year spreadsheets shows that in 2008, an Oxy jet flew to Georgia for one day. In March 2009, one Oxy jet flew to Georgia for one day; and in December 2009, it flew to Georgia for two days. The next year, it made a single one-day trip to Georgia. In short, over three years, Oxy jets made a total of four trips to Georgia, for a total of five days. Oxy explained its contacts with Georgia in the

12

single sentence: "OxyChem [a subsidiary] operates a chemical plant in Augusta, Georgia."[10] If the board had actually found that Oxy established a tax situs for its jets in Georgia based on four short trips over three years, we would conclude that such a finding was unsupported by the evidence. We do not suggest that the presence of a subsidiary's plant in Georgia is irrelevant (*Ice Capades, supra,* 56 Cal.App.3d at pp. 733-734); it may explain Oxy's *reason* for regular and consistent flights into Georgia and may put into context whether Georgia has provided Oxy's planes the "opportunities, benefits or protection" necessary for tax situs. Nevertheless, four flights over three years, with a total stay of five days, is as a matter of law, transitory, no matter the nature of Oxy's other contacts with Georgia.

In short, Georgia – a location for which the board ordered tax allocation – is not, on the evidence, a tax situs. As such, we cannot imply a board finding that it was. Moreover, this confirms that the board did not, in fact, review the necessary evidence and make individual location-by-location determinations of whether each of the 31 claimed tax situses was, in fact, a tax situs. The trial court did not err in remanding the matter to the board for necessary findings.

Oxy next suggests that if this court concludes that the board did not make the necessary findings on tax situs, we can do so on appeal. We decline the invitation. While we acknowledge that the necessary data for determining the critical factor of flight *frequency* is present in the administrative record, in the form of the flight logs and jet-by-jet/year-by-year spreadsheets, we see no reason to go spelunking for it. Oxy has failed to brief in this court *exactly* what it failed to brief before the board – a location-by-location analysis of the frequency and regularity of its fleet's contacts with each location.

---

**10** From 2003 through 2011, the number of employees of Oxy and its subsidiary in Georgia ranged from a low of 6 to a high of 13.

13

### b.     *The Statement of Decision Need Not be Modified*

Oxy's final contention on appeal is that, in two respects, the trial court put improper or misleading statements in its statement of decision.  Because the court ordered the board to issue new findings "in light of" the court's statement of decision, Oxy challenges two distinct sentences in the statement of decision as possibly causing confusion on remand.

First, Oxy challenges the trial court's purported statement that Oxy's evidence "does not indicate how frequently a plane flies to any particular location."  Oxy argues that its evidence, in the form of the raw flight logs, did, in fact, indicate how frequently a plane flies to any particular location.  Oxy takes the court's statement out of context.  Later in its opinion, the court noted that "it appears that Oxy presented sufficient evidence from which tax situs can be determined," and specifically referenced the flight log data.  In any event, the court did not state that *Oxy's evidence* does not indicate frequency; the court stated that the evidence *cited by the board* did not indicate frequency.  This is correct; in discussing its findings, the board did not rely on the flight logs at all.[11]

Second, Oxy challenges the trial court's purported statement:  "The mere existence of an Oxy business location, the fact that Oxy flies there, and the number of plane trips made by Oxy planes is not adequate evidence to determine *that* each of the 31 locations has the right to an apportionment of property tax increment."  We have italicized the word "*that*," because Oxy omitted it from the trial court's quote.  Oxy argues that the court's statement suggests that Oxy's evidence of business location and number of trips is not sufficient evidence *from which tax situs can be determined*.  But the court did not say

---

[11]     Oxy suggests that the trial court failed to notice that Oxy's evidence contained the raw data from which frequency could be extrapolated – and this failure caused the trial court to incorrectly conclude that the board did not make tax situs findings based on frequency.  To the contrary, the court noted that, in reaching its conclusions, the board did not expressly rely on any evidence regarding frequency.  This supported the court's conclusion that the board did not, in fact, make the necessary findings regarding tax situs.

14

that; the court said evidence of business location and number of trips is not sufficient evidence *to establish that tax situs exists*. This is indisputably correct. Oxy has a business location in Georgia to which it has flown four times in three years. This is enough evidence from which tax situs can be determined; it can be determined that there is no tax situs for Oxy's fleet in Georgia.

## DISPOSITION

The judgment is affirmed. The parties shall bear their own costs on appeal.

RUBIN, J.

WE CONCUR:

BIGELOW, P. J.

FLIER, J.

15